Gaston, Judge.
 

 The pleadings upon this information present two questions, on which the judgment of the Court is required, for the purpose of eífecting a settlement of certain matters of account between the state and the bank. To understand these questions, it is necessary to examine briefly the provisions of the several acts of assembly bearing upon the matters in controversy, and the proceedings on the part of the oflicers of the bank which are complained of in the information. The bank was created by an act of assembly passed in the year 1810, entitled “ an act-
 
 to
 
 redeem the paper currency now in circulation, and to establish a bank, by the name and title of The State Bank of North Carolina.” It was thereby enacted, that a bank should be established with a capital of one million six hundred thousand dollars: that it should be lawful for the treasurer of the state to cause to be subscribed, for and in behalf of the state, the sum of two hundred and fifty thousand dollars; which sum should be reserved for the use of the state, to be paid for in stock of the United States, and “ the residue in gold or silver, at such time or times as it might be convenient for the state to pay the same that books should be opened to receive the subscriptions of individuals for shares of one hundred dollars a share, in. the capital stock of the bank; which shares were to be paid for, one-fourth to the commissioners, at the time of subscription; one-fourth within sixty days after the bank should go into operation ; one-fourth within one hundred and twenty days; and one-fourth within twelve months, to the directors of the bank; and that the subscribers to the bank, their successors and assigns, should be a corpo-. ration, and so continue, until the 1st of January, 1830., The subscription in behalf of the state was made accordingly by the public treasurer; and the stock of the United, States belonging to the state was transferred to the corpo-. ration in part payment. In 1811 another act was passed, modifying in several respects the provisions of the original
 
 *547
 
 charter. This act is entitled* “ an act in addition to the act entitled ‘ an act to redeem the paper currency now in circulation, and to establish a bank, by the name and title of The State Bank of North. Carolina,’ passed in the year 1810.” It contains this provision — “the president and directors of the bank shall not he bound to pay to the state full dividends upon the whole sum of two hundred and fifty thousand dollars of the stock of the said bank reserved by the above-recited act, to the use of the state, and upon which, by the said act, the state is entitled to full dividends; but it is hereby declared lawful for the said president and directors, out of the full dividends to be declared on the said sum of two hundred and fifty thou-, sand dollars held by the state in their stock, to retain at the end of each year, for the general benefit of the stockholders, including the state, a sum equal to four per cen-tum upon such part of the said stock as shall not have been actually paid for by the state, on the day when the dividend is declared out of which the retainer is to. be made.” Bv this amendatory act, which was accepted by the stockholders, as a modification of their charter, the term,, of the corporation was extended to the 1st of January, 1835.. Payments were afterwards made by the state on account of the stock so reserved for its use, and subscribed for by the treasurer, but not in full therefor; and the bank received every year from the state, by retainer out of the dividends of profits declared upon this stock, an interest of four per cent, on the balance remaining unpaid. In the session of 1829. an act was passed, entitled
 
 “
 
 an act to enable the State Bank to wind up gradually, and to fix a uniform rate of collection.” This act, under certain limi-' tations and restrictions, continued the corporate powers of the institution until the 1st of January, 1838; prohibited the making of new loans, except in renewal or substitution for a subsisting debt, after the 31st of December, 1834: prohibited the making of accommodation loans,, after the 1st of September, 1830, on more indulgent terras than the payment of three equal instalments every ninety days; prohibited the issuing of notes under five dollars, after the 31st of December, 1832; and the issuing of any notes
 
 *548
 
 after the 31st of December, 1834; required, of the president and directors so to regulate the collection of debts a]rea(jy cju6) as t0 permit them to be paid by instalments of a twentieth every ninety days; authorized the president and directors to receive shares of stock in the bank in payment of debts at a reasonable value, to be fixed on by the stockholders, and to, be approved of by the public treasurer; authorized the stockholders, after the 1st of’ January, 1833, to. declare dividends of the capital,, as the same should accumulate,, provided that the amount of capital should not be reduced to less than the amount of debts due from the bank; and made other provisions for the convenience of the institution and the community, which were called for by the approaching expiration of
 
 the
 
 charter.
 

 This act was accepted by the stockholders in general meeting, on the 12th of January 1830 ; and on the sue-, ceeding day the stockholders passed a resolution authorizing the president and directors to receive shares of the stock of the bank,, in payment- of debts at seventy-five dollars per share, which resolution was approved by the treasurer of the state.. In December 1830, 1831 and 1832; the president and directors declared dividends of profits upon the capital of the. bank, of four per cent, and passed the same to. the credit of the state on account of her stock, which then greatly exceeded the two hundred and fifty thousand dollars originally subscribed for, but retained out of the dividends so declared four percent, on the unpaid part of the stock so.subscribed for. On the 14th of January 1833, the stockholders in general meeting declared a dividend of capital of fifty per cent, to be paid to the respective stockholders, after the 1st of February, then next ensuing. When the treasurer claimed the dividend of capital on the stock of the state, the officers
 
 of the
 
 bank claimed as of right to deduct therefrom, 'the sum of eighty-three thousand nine hundred and six dollars, and eleven cents, the whole sum remaining unpaid of the state’s original subscription ; and. refused to pay more than the balance after making this deduction,. In December 1833, the president
 
 *549
 
 and directors declared a further dividend of profits of two per centum.
 

 The first question raised, is as to the right of the bank to apply this sum of eighty-three thousand nine hundred arid six dollars and eleven cents, to the entire extinguishment of the debt of the state. The information insists, that by the original act of incorporation, the state was to pay “ the residue of its subscription at such time or times as to the state might be convenient;” and that of this convenience the state was the exclusive judge : that under the amenda-tory act of 1811, a compact was entered into between the state and the bank, by which the former had an option to pay the balance which it owed for its subscription, and take full dividends of profits on all its stock, or to leave the balance unpaid until the end of the charter, paying an interest of four per cent, out of the annual dividends: that under the act of 1829, the state claimed and had to claim one half of the said sum of eighty-three thousand nine hundred and six dollars and eleven cents, to be applied to the extinguishment of the stock debt of the state, and no more than one half, and to receive the residue of its dividend of fifty per cent, on its capital stock. On the part of the bank, it is contended, that the state was bound in good faith to pay “ this residue of its subscription” so soon as it could be done without interfering with the discharge of other engagements, or the necessary and proper expenses of government; and that this payment might have been thus conveniently made, when the bank so applied the money of the state in its hands: that this original obligation was in no way impaired by the amendatory act of 1811; and that at ail events when under the act of 1829, the business was to be finally closed, and the joint stock paid out to the holders, the bank by a most evident equity, was entitled to retain and apply the dividends on the stock of the state, as a corporator to the payment of a debt from the state to the corporation. The Court entertains no doubt, but that under the act of 1810, the state had the exclusive right to decide when the public convenience would permit of the payment for stock, at any time or times before the expiration of the charter. The argument of the
 
 *550
 
 defendants on this point is, that if an individual promise to pay money, or to do any other act when it may be convenient to him, he is bound to perform it when he can do so without difficulty ; and whether he can or not, is a question to be adjudged by the Courts, and not to be decided by himself — and that although the state cannot be sued and thereby compelled to perform an engagement to which it has been inattentive, yet the rules of justice are the same, with respect to states as to individuals, and demands of the state may be met and repelled by just counter claims against the state. It
 
 may be,
 
 that if an engagement should be made by an individual to do an act or to pay money at a convenient season, and it cannot be collected from the nature of the contract, that there is any period within which it must, convenient or inconvenient, be complied with, the Courts might from necessity construe convenience to mean ability or reasonable time, because otherwise the engagement would be nugatory. All deliberate engagements are presumed to mean something, and intended to confer rights upon those with whom they are made; and therefore, a construction must be put upon them, if it may be, which will prevent them from being turned into a mockery. But where an engagement to do an act, from the terms of the contract, fixes a time
 
 within
 
 which it must be performed, but allows a latitude for its performance within that period, according to the convenience of the party who is to do the act, it would seem that the individual himself must be the judge of what his own convenience prescribes. There is a period limited by the act of incorporation, within which the stock must be fully paid for. The payment is to be made to the corporation, and the life of the corporation is defined in the act. Such, we think, would be the construction of this contract, if made by an individual; but however this might be, any other construction of it as a contract on the part of the state, is inadmissible. Courts of justice may ascertain whether an individual under the pretence of convenience, is guided by caprice, or influenced by dishonesty. But how can
 
 they
 
 judge of the public convenience?
 
 That
 
 involves the consideration of numerous
 
 *551
 
 questions of policy, conflicting claims between the different interests, wound up in the public welfare; the various demands upon the state for justice, protection, relief arid improvement, compared with the resources which can be commanded to meet them — upon all which by the fundamental institutions of the state, none can pass but the legislature. Public convenience is not a subject of judicial inquiry. To pay at such time or times, during the continuance of the charter as may be convenient the state, is equivalent to paying at such time or times, during the continuance of the charter, as the state shall determine. This, no. doubt, was the construction put upon these terms in the original act, and furnished one of the reasons for the modifications of the charter, to be found in the amendatory act.. It was uncertain when the public convenience would admit of payment; and it was thought hard, that the state should receive full dividends on stock» for which it had not paid, and for which it might not pay until the end of the charter. The act of 1811, asserted, that the right of the state to full dividends on the unpaid stock, in direct terms, left the state still free to pay at any timeshort of the expiration of the charter, and secured to the bank,, if its affairs were properly managed, an interest of four per centum, until payment should be made. It cannot be, if the contract were understood otherwise, and the state were supposed to be deferring payment, to the injury of the institution, but that some remonstrance or memorial to the legislature, invoking its justice, or some request for payment, would have been made by the bank before the year 1833. The information is explicit in charging that there was none such. The answer pretends, not to aver that there was, but
 
 argues
 
 that on the face of the information, such a demand appears. We presume that reference is here made, to that part of the information w:here it is charged, that the act of 1816, under which an issue of small treasury notes was made, to the amount of eighty thousand dollars, and under which these were paid into the bank, on account of the debt of the state, was enacted
 
 at the request
 
 of the bank. The answer is not on oath; it does not set up a demand otherwise than as inference
 
 *552
 
 from the matters charged, and the inference is not conclusive. It by no means follows, if the word “ request,” be ta^en ¡n jts strongest sense, that it was a request
 
 for pay - merit.
 
 There were many considerations
 
 oí supposed expediency,
 
 on the part of the bank, as well as of the state, for the making of this
 
 paper change,
 
 which may have prompted the measure. But, in truth, what is called “ request,” is nothing more than assent. The preamble to the act of 1816, declares, that the stockholders in general meeting had given their assent to the measure; and upon looking into the resolution of the stockholders, we find it declared that “ the proposition,” to which their assent is given, comes from ‘‘ a committee of the legislature.” The Court is therefore of opinion, that there was a well-understood arrangement between the state and the bank, by which the former had an option to defer payment of the debt due upon its subscription for stock, on allowing the bank to deduct an interest thereon of four per cent, out of the dividends upon the whole amount of the stock taken by the state in that subscription, or to hasten the payment thereof, and demand full dividends on all its stock.
 

 
 *550
 
 If an individual promise to pay-money, or to do any other act, when it may be convenient to him,
 
 it may be,
 
 that the Courts would, from necessity
 
 ut
 
 res
 
 magis vale-at quam pereat,
 
 construe convenience to mean ability, or a reasonable time.
 

 But where an engagement to do an act, from the terms of the contract, fixes
 
 atima within
 
 which it must be performed, but allows a latitude for its performance, within that period, according to the convenience of the party
 
 *551
 
 who is to doBankdo the act, ge^“u^at the íñdívi-be the sole J^at his own conve-™-1bceeg_pre'
 

 
 *552
 
 Upon a dissolution of a copan-nership, a ontsac^ counts becomes in-
 
 *553
 
 dispensable and must in. elude all debts due to the company, whether from its members or others; and all debts due from the company either to the partners or strangers. But upon a partial division of capital, such a settlement is not indispensable. Whether upon an agreement for such a division, any one of the partners can ba required to take his own debt in payment of his part of the capi. tal, depends upon the fact whether the debt be then de-mandable. If it be, this may be insisted on; but if it be not the agreed division of capital does
 
 *554
 
 not
 
 per se
 
 change the character of the debt.
 

 
 *552
 
 It is insisted, however, that as by the act of 1829, a division of part of the capital was authorized, and in pursuance of that act, an actual division of one-half was ordered by the stockholders, then the corporation had an equity to require that the debt of the state should be paid, before the state should receive its dividends. It is to be regretted, that the act of 1829, made no explicit provisions upon what should be the effect on the debt of a partial division of capital, and that we have to find out, as well as we can, what in justice ought to be its operation. If the debt be regarded
 
 simply
 
 as one due to the corporation from one of its corporators j then the equity insisted on, must be that applicable to all partnerships, whereby the debts of the partners are to be paid up, or taken into account when the partnership is dissolved. No individual member of the firm is entitled as such to a portion of its # 1
 
 funds,
 
 but only to his share of what belongs to the comPany after the settlement of its accounts. Upon a dissolution, this settlement becomes indispensable; and it must
 
 *553
 
 include all debts due to the company, whether from its members or others; and all debts due from the company either to the partners or strangers. Until this adjustment, it cannot be seen what is to be distributed; whether the capital has been swollen by profits, or diminished by losses; or whether there be any capital to be distributed. But on a partial division of capital, such a settlement is not indispensable. The parties, on ascertaining to their satisfaction, that one-half of the capital is as muchas is needed for the satisfaction of all demands against the company, and for the further prosecution of their business, may agree to return to each the half of what he has put into the common stock. Whether, upon an agreement for such a division any one can be required to take his own debt in payment of his part of the capital, must depend, we think, upon the fact, whether the debt be then demandable. If it be, this may be insisted on; but if it be not, it is difficult to see why the agreed division of capital should
 
 perse
 
 change thecharacter of the debt. No doubt several of the debtors of the bank, were to be found among its stockholders. Were not these entitled to renewals upon the payment of instal-ments, under the act of 1829? Could the bank have sequestrated their dividends of stock, in order to force
 
 immediate
 
 payment of any debts which, either by the terms of their engagement, or by the construction of law, were not then absolutely demandable ? The equity set up is not sustained, we think, upon the ground that all the debts of the partners must be settled before a final dissolution of the partnership.
 

 But it is not correct to regard the debt of the state, as a debt due from one of the corporators
 
 independent
 
 of its stock in the corporation, and either originally contracted upon an"'engagement distinct from its contribution to the capital stock, or accepted in lieu of such a contribution. This debt is informally spoken of as due because of “ a part of the stock not paid for, but to be paid for.” It is a part of the state’s contribtuion to the capital stock kept back upon an agreement that the state may receive a share of profits thereon, as though it had been advanced, subject to certain stipulations as to interest, but which
 
 *554
 
 part the state is bound to put into the capital before the expiration of the charter-. So far as profits are concerned, it is the stock of the state in the bank; but in a division of capital, it must be considered as a part of the capital of the bank in the hands of the state. Upon a division of capital it cannot be claimed. For such a division is but a restitution to the associates of what they have advanced as capital. Upon a final settlement-, if the capital be unimpaired, the debt is extinguished, becuase it were idle to pay it in, and then demand its immediate return. If the capital be impaired the state is bound to pay so much thereof asisin proportion to the loss sustained on the capital. When,instead of an entire,a partial division ofcapital takes place, the state can claim no
 
 restitution
 
 because of this portion of the capital in its hands ; nor is it bound to pay for this part of the capital sooner than it had contracted to pay. The state is entitled to receive, on a partial division, an aliquot part of what it would have been entitled to-receive, on a complete division. As a complete division operates an entire extinguishment of a debt because of unpaid capital, it seems to follow that a partial division operates an extinction of it
 
 pro tanto.
 
 On a final division, should it be ascertained that the capital is impaired, the state’s obligation to pay its proportional loss on this part of its stock, remains in full force. We have had some difficulty.upon this point, because of the pledge of the dividends of the whole original stock of the state as a fund for the payment of four per cent, on this part of it. This pledge could not be taken away without the consent of the institution. But the division of capital is by consent.
 

 The compact is to be found in the act of 1829, ratified by the stockholders. There is no objection made, because of a weakening of the pledge; any objection on that account would have been unreasonable and captious. The diversion of capital is in anticipation of a final dissolution. There could be little expectation of many dividends of profits thereafter; and if any such should occur, a pledge of dividends on half the stock would furnish as ample a fund for the payment of interest on half the debt, as of dividends on the whole stock for the payment of the
 
 *555
 
 interest upon the whole debt. Upon the best consideration which the Court has been able to take of this question, it ‘is of opinion, and so declares, that the bank under the resolution for
 
 the
 
 division of fifty per cent. on the capital stock, 'ought to have retained out of the state’s dividend but the 'Sum x>f forty-one thousand nine hundred and fifty-three dollars five and a half cents; to have applied the same to the extinguishment of the debt of the state
 
 pro tanto,
 
 on the unpaid part of its stock; and to have paid over to the state a full dividend of fifty per cent, upon the residue of its stock: and it further declares that if it shall appear upon the expiration of the charter, that the bank has not assets wherewith to restore to the stockholders, including all dividends of capital theretofore made, the amount of capital stock respectively advanced, the slate will be chargeable in account with the bank for so much of this debt as will make the loss of the state upon each share of its stock the same with that borne by the other shares.
 

 The second question raised by the information and the answer is, in respect to the dividends of profits made by the president and directors in 1830, 1831, 1832 and 1833. The information charges, that before any of these dividends were declared, it had been ascertained, that the capital of the bank was impaired: that there could be no profits to be divided until the capital w7as restored : that these declarations were illegally made: that by means of such illegal declarations the bank charged the state with four per cent, as interest on its unpaid stock, and unjustly withheld that amount; and that these illegal declarations were made with the view, that by means and under colour thereof the bank should exact interest to which it was not entitled. The answer denies peremptorily the
 
 motive
 
 assigned in the information for declaring these dividends ; denies the fact, that when they were declared the capital had been impaired; insists on the difficulty that must always exist in estimating with precision the state of a bank; and contends, that when profits are declared
 
 bona fide,
 
 upon an estimate founded on probable data, such division ought not to be held illegal, if the estimate prove
 
 *556
 
 to be erroneous. The Court is of opinion, that the inquiry as to the alleged motive for making the dividends is imma-ter¡a]. for jf the dividends were made as of profits, after it was ascertained, as far as such a fact could reasonably be ascertained, that the capital was broken in upon; whatever might be the motive for declaring the dividend, it was in truth a dividend of capital, not of profits ; and the bank had not a right, under the compact in the amendatory act, to charge the state with interest. The Court recognizes the difficulty set up in the answer, of distinguishing between apparent and real profits; and holds, that a division made of apparent profits is not to be deemed irregular, until there is sufficient reason to know, or to believe, that the apparent are not real profits. Upon the question of fact, whether the dividends so declared, and if so, which of them, were in effect dividends of capital, under the name of profits, the Court will not now decide. There is, indeed, a very strong
 
 prima facie
 
 case made in respect to this controverted fact, on the part of the state. It appears, from a statement made of the affairs of the institution, at a general meeting of the stockholders, the 1st of June, 1829, that the capital of the bank is then represented as impaired to the amount of one hundred and fifty-two thousand eight hundred and seventy-eight dollars, and seventeen cents. To lessen this loss on the capital, there is mentioned the contingent gain to be derived from lost notes. But this contingent gain cannot legitimately form an
 
 item
 
 in
 
 the
 
 estimate of the condition of the bank. The institution must be regarded as actually owing the whole amount of its unredeemed issues; and no notice can be taken of any profits derived from the loss of these evidences of debt, until the institution is at an end, when they may fall into the general fund of bank assets, as unclaimed debts. About seven months after this estimate of loss was spread before the stockholders, they proceeded, by a committee, to ascertain the value of stock, and to consider and determine the proper price upon which stock might be taken in payment of debts. This committee reported, that they had been unable to ascertain to their satisfaction the value of the
 
 *557
 
 stock; but that there was a continuing depreciation in the value of the real estate of the bank: that heavy losses had been sustained, and heavy losses were anticipated on probable grounds: that under these circumstances, they believed it their duty to fix a price on the stock which would not endanger the interests of the stockholders not indebted to the institution, and which it would be at the option of the indebted stockholders to avail themselves of or not, by paying in stock or money. Upon this report, the stockholders fixed the price at which stock might be received in payment of debts at seventy-five dollars per share. It is apparent, that in fixing this price, the stockholders acted upon the principle of an estimation which should not transcend the value, and not of an estimation of actual value. But there is no indication whatever then exhibited of a better state of things than had been presented in the preceding meeting of June; and it must be believed, that however cautious they may, as they ought to have been, not to fix too high a value on the stock, they did, in the true spirit of the act of 1829, declare what they considered a
 
 reasonable
 
 value. But an inquiry is indispensable to ascertain if the capital of the bank were impaired when the first dividend of profits is alleged to have been illegally declared; what was its condition when the subsequent dividends were declared: and the Court prefers that the inquiry shall be open as to the state of the bank, even at the time of the first dividend. An. interesting question may arise upon the coming in of the-report, upon which no opinion is expressed, because it is-not certain that it will arise; and it is mentioned now, in order that either party may have the inquiry so conducted, as to present it distinctly upon the report. That question is, if dividends of capital have been paid over to the state as dividends of profits, whether an equity does not arise against the state to allow the interest of four per cent., on its unpaid stock, from the time when dividends of profits might legitimately have been declared, if the dividends of capital had not been withdrawn.
 

 Thd Court declares that the state was not liable for the payment of interest on its unpaid stock, except' out of
 
 *558
 
 dividends of profits to be declared by the bank on the original stock subscribed for the state j that dividends made as of profits, when the capital stock of the bank was impaired, are not dividends of profits, but of capital: that the rightfulness of such dividends of profits depends upon the state of the bank at the time of the declarations respectively, according to the knowledge and means of information then possessed by the directors of the bank ; and directs an inquiry to be made by Edmund B. Freeman, a commissioner for that, purpose appointed, into the state of the bank at the times respectively when the dividends complained of in the information, were declared.
 

 The Court directs that the commissioner shall be armed with full powers to examine all persons whom either parly may desire to be examined ; and to require from the officers of the state and of the bank, access to, and inspection of, all books, documents and papers required for the purposes of this inquiry.
 

 The Court authorizes the inquiry by the commissioner to embrace any special matter which either- party may deem material, as tending to facilitate the settlement of the matters of account between the parties. And it reserves the case for further consideration upon the coming in of the report of the commissioner.
 

 Per Cumam. Decree accordingly.